IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| MICHAEL R. RAY, | ) Civil Action No. 4:04-cv-23048-TLW-TER |
|       Plaintiff, | ) |
| v. | ) |
| | ) REPORT AND RECOMMENDATION |
| SHERIFF JAMES R. METTS, LEXINGTON COUNTY SHERIFF'S DEPARTMENT; SHERIFF JIMMY GREGG, FLORENCE COUNTY SHERIFF'S DEPARTMENT; MICHAEL ILLES, ADMN. FLORENCE COUNTY DETENTION CENTER; JUNE STEWART, EMPLOYEE FCDC, THE COUNTY OF FLORENCE; THE COUNTY OF LEXINGTON, | ) ) ) ) ) ) ) ) |
|       Defendants. | ) ) |

## I. PROCEDURAL BACKGROUND

The plaintiff, Michael R. Ray, filed this action under 42 U.S.C. § 1983[1] on November 30, 2004, alleging violations of his constitutional rights. On July 25, 2005, plaintiff filed an amended complaint. (Doc. #40). Since the filing of this action, plaintiff has been released from incarceration. On February 10, 2006, defendants[2] filed a motion for summary judgment. (Doc. #74). Because plaintiff is proceeding pro se, he was advised on or about February 13, 2006, pursuant to Roseboro

---

[1] All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d),DSC. Because this is a dispositive motion, the report and recommendation is entered for review by the District Judge.

[2] A separate report and recommendation is being entered as to defendants Florence County and Lexington County's motions for summary judgment. Therefore, "defendants" refers to the remaining defendants in the caption.

v. Garrison, 528 F.2d 309 (4th Cir. 1975), that a failure to respond to the defendants' motion for summary judgment with additional evidence or counter affidavits could result in dismissal of his complaint. This case was stayed on June 22, 2006. On April 15, 2008, by order of this court, plaintiff was given until October 17, 2008, to file his response to the motion for summary judgment. On November 12, 2008, an order was issued by this court staying the case and motion for summary judgment until April 15, 2009, and at which time the Clerk of Court was directed to lift the stay and plaintiff was informed that he would have fifteen (15) days from that time to file a response to the motion for summary judgment or his case may be dismissed for failure to prosecute. On May 5, 2009, an order was issued as a result of numerous motions filed by plaintiff and plaintiff was given until Friday, May 15, 2009, to file a response to the motion for summary judgment or it would be recommended that this case be dismissed for failure to prosecute. Plaintiff appealed this order to the district court who denied the appeal and adopted the prior Order. On May 19, 2009, plaintiff filed a response but did not address the merits of defendants' motion. Instead, plaintiff argued that he should be entitled to take depositions in this case in that he was in incarcerated in New Jersey for a period of time during the pendency of this action and could not take any depositions. (Doc. #142).[3]

## II. DISCUSSION

### A. ARGUMENT OF PARTIES/ FACTUAL ALLEGATIONS

Plaintiff alleges in his complaint that his constitutional rights were violated while housed at the Florence County Detention Center and the Lexington County Detention Center (hereinafter "the

---

[3] Plaintiff has not previously filed a motion requesting to take depositions in this case. However, plaintiff's motions to compel were granted in part and denied in part by Order filed April 15, 2008. ( See doc. #93).

Detention Centers") at various periods of time. Specifically, plaintiff makes allegations regarding his ability to receive mail, packages, newspapers, and magazines. Plaintiff further makes allegations that this violated his First and Sixth Amendment rights.

As to LCDC, plaintiff alleges that he was housed there from October 1, 2004, until December 3, 2004, during which time he received cards, letters and other U.S. mail addressed to him. Plaintiff asserts that during this time period, he had several pieces of mail which were properly addressed to him and mailed to him returned to the sender by the LCDC employees marked either "Return to Sender-Too thick" or "Returned to sender-too large." Plaintiff asserts that the LCDC staff makes an actual copy of the envelopes and the ones being returned are indicated as such and the inmate is asked to sign the face of the photo copy to indicate an apparent "knowledge" that the materials have been returned but "the inmate is offered no opportunity to protest the return of any such item." (Amended complaint, p, 12). Plaintiff argues that the rules of the facility are vague and ambiguous and fail to offer any specific in regard to what is allowed or what is not allowed. Plaintiff asserts that on more than one occasion, he received materials from various local, county and state governmental agencies and some of the materials were marked "Legal Mail" but the staff returned same. Plaintiff attaches Exhibit B in which he asserts that the facility staff warned him that two envelopes were too thick and to let family know or whoever know no more than 4 sheets next time or the material would be returned. A review of this exhibit reveals that it was an envelope from the Office of Public Information addressed to plaintiff at the LCDC. It was marked "too Thick Let family or who ever know no more than 4 sheet Next time will Return." (Plaintiff's Exhibit B). Thus, it appears that this envelope was in fact delivered to the plaintiff and not returned. Plaintiff also asserts that on one occasion he received a 9" x 12" manilla envelope from the State of South Carolina Public Service

3

Commission but the envelope was returned and marked "too large." (Amended complaint, p. 13). Plaintiff asserts that "at no time herein were any inmates allowed to receive any form of Second Class or Third Class mail. Only letters were delivered to inmates." (Amended complaint). Plaintiff asserts that there was an unwritten rule in that an envelope from a local church was allowed to be delivered to the inmate regardless of size or thickness. Plaintiff further alleges that "At no relevant time herein did the plaintiff ever witness any inmate receive any catalog, flyer, sale paper, etc." (Amended complaint). [4]

As to the FCDC, plaintiff asserts that he was housed there from February 12, 2004, until March 3, 2004, and again from June 29, 2004, until August 9, 2004. Plaintiff alleges that in "direct retaliation for complaints and requests formerly submitted about her, defendant June Stewart, did in fact open, inspect and read a communication in an envelope clearly from Mr. A. C. Michael Stephens, Esq. (Which thereupon indicated that he was an Attorney at law)" in violation of his constitutional protections. (Amended complaint, p. 16). Plaintiff further asserts that while at the FCDC he received letters, cards, magazines, and newspapers which were mailed to him at various respective classes of mail through the postal service for regular delivery to the plaintiff. Plaintiff alleges that on more than ten (10) occasions, he received or should have received mail which was addressed to him "summarily returned to sender" and the mail was marked "Return to Sender-Contents Not Authorized" or "Return to Sender-Unauthorized Communication." Plaintiff asserts that on more than ten occasions, he received "mail to be delivered to him at the facility address which

---

[4] As plaintiff is attempting to bring allegations with regard to alleged violations to other inmates, the claims fail as plaintiff does not have standing to bring claims as to alleged injuries to other inmates. To state a civil rights claim, one must allege that he, himself, sustained deprivation of right privilege, or immunity secured by the Constitution or federal law. Inmates v. Owens, 561 F.2d 560, 562-562 (4th Cir. 1977).

was Second Class matter (newspapers and magazines) directly from the publisher and that he subscribed to the daily newspaper "The Sun News" and the weekly newspaper "The Horry Independent" and the weekly newspaper "The Myrtle beach herald" and several weekly and monthly magazines (such as Time, Newsweek and People)." (Amended complaint, p. 17). Plaintiff asserts that sometimes he would receive his newspapers but that Stewart had the unwritten rule that you could only receive one issue of each publication and she discarded any remaining issues that may arrive together. Plaintiff admits that he could receive "(1) Sun News, (1) Horry Independent and (1) Myrtle Beach Herald all at the same time which was not considered by her or the staff to be a fire or other hazard. However, plaintiff asserts that if three Sun News issues arrived on Monday then he would receive the most current issue and the other two were discarded. (Amended complaint). Plaintiff asserts that all second class mail consisting of magazines were simply thrown away and never delivered to the inmate. Plaintiff asserts that Stewart had "unfettered and free reign to invent and/or develop rules as she went along, per se." (Amended complaint). Plaintiff seeks injunctive/declaratory relief plus actual and punitive damages.

Respondents filed a motion for summary judgment arguing that plaintiff has failed to show a claim for denial of access of the courts, a First Amendment claim, or a Sixth Amendment claim. Defendants further argue that they are entitled to Eleventh Amendment and qualified immunity.

## B. STANDARD FOR SUMMARY JUDGMENT

A federal court must liberally construe pleadings filed by pro se litigants, to allow them to fully develop potentially meritorious cases. See Cruz v. Beto, 405 U.S. 319 (1972), and Haines v. Kerner, 404 U.S. 519 (1972). In considering a motion for summary judgment, the court's function

is not to decide issues of fact, but to decide whether there is an issue of fact to be tried. The requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege facts which set forth a federal claim, Weller v. Department of Social Services, 901 F.2d 387 (4th Cir. 1990), nor can the court assume the existence of a genuine issue of material fact where none exists. If none can be shown, the motion should be granted. Fed. R. Civ. P. 56(c). The movant has the burden of proving that a judgment on the pleadings is appropriate. Once the moving party makes this showing, however, the opposing party must respond to the motion with "specific facts showing that there is a genuine issue for trial." The opposing party may not rest on the mere assertions contained in the pleadings. Fed. R. Civ. P. 56(e) and Celotex v. Catrett, 477 U.S. 317 (1986).

The Federal Rules of Civil Procedure encourage the entry of summary judgment where both parties have had ample opportunity to explore the merits of their cases and examination of the case makes it clear that one party has failed to establish the existence of an essential element in the case, on which that party will bear the burden of proof at trial. See Fed. R. Civ. P. 56(c). Where the movant can show a complete failure of proof concerning an essential element of the non-moving party's case, all other facts become immaterial because there can be "no genuine issue of material fact." In the Celotex case, the court held that defendants were "entitled to judgment as a matter of law" under Rule 56(c) because the plaintiff failed to make a sufficient showing on essential elements of his case with respect to which he has the burden of proof. Celotex, 477 U.S. at 322-323.

## C. ANALYSIS

**Access to courts**

As to any claim with regard to access to court, this claim fails. Plaintiff has not shown any actual injury.

As to claims of access to courts through legal mail, prisoners do not have a cause of action under § 1983 for negligent interference by prison officials with their right of access to the courts. (Pink v. Lester, 52 F.3d 73 (4th Cir. 1995), ("negligent denial of access to the courts is not actionable under § 1983" ). A prisoner must allege adverse consequence as a basis for allegations that the delay or non delivery deprived him of meaningful access to the courts. White v. White, 886 F.2d 721 (4th Cir. 1989) and Morgan v. Montanye, 516 F.2d 1367 (2d Cir. 1975 ) cert. denied, 424 U.S. 973 (1976). Actual injury must be more than theoretical deficiencies, it is showing that the alleged deficiencies have hindered or are hindering a prisoner's efforts to pursue a legal claim. Lewis v. Casey, 518 U.S.343 (1996). Plaintiff has failed to meet this burden.

Additionally, as to plaintiff's claim that defendant Stewart opened a letter from an attorney in retaliation as to a complaint about her, the issue fails. Retaliation against prisoners for exercise of right of access to courts states claim. Hudspeth v. Figgins, 584 F.2d 1345, 1348 (4th Cir. 1978). However, failure to show that retaliation had adverse impact on exercise of constitutional right defeats claim. American Civ. Liberties Union v. Wicomico County, 999 F.2d 780, 785 (4th Cir. 1993). Even assuming, Stewart did open a piece of legal mail, plaintiff has not alleged or shown an adverse impact or that he suffered an actual injury. Furthermore, although plaintiff asserts that because the return address was marked Mr. A. C. Michael Stephens, Esq., it indicated that he was an attorney and it was legal mail, the policy that was submitted by defendants from the FCDC clearly states that any mail from offenders attorney must be clearly marked that it is "Attorney-

7

Client Mail" and will be opened in the presence of the offender. Plaintiff does not allege that the envelope to which he has referenced stated that it was attorney-client or that it was legal mail. No constitutional violation arises if mail which is not properly marked (that the legal sender is specifically identified and the mail is marked confidential) is opened outside the inmate's presence. United States v. Stotts, 925 F.2d 83 (4th Cir.1991). Accordingly, it is recommended that summary judgment be granted with respect to this allegation.[5]

**First Amendment**

Inmates clearly retain their First Amendment right of free speech in prison. See O'Lone v. Estate of Shabazz, 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). However, in Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), the Court found that a prison regulation infringing on an inmate's constitutional rights is valid so long as it is reasonably related to a legitimate penological interest. Id. at 89. The Court also recognized that deference should be given to the decisions of prison administrators, especially when those decisions deal with issues of prison safety and security. Id.

In Turner, the Court identified four factors to consider: (1) Whether the regulation is rationally related to a legitimate and neutral governmental objective; (2) Whether there are alternative avenues that remain open to the inmates to exercise the right; (3) The impact that accommodating the asserted right will have on other guards and prisoners and on the allocation of prison resources; and (4) Whether the existence of easy and obvious alternatives indicates that the

---

[5] Additionally, plaintiff has failed to state a claim that arises to a Sixth Amendment violation. Plaintiff has not shown that he was represented by counsel or that his rights were prejudiced by the alleged opening of a letter with a return address from an attorney by defendant Stewart or any other defendant.

8

regulation is an exaggerated response by prison officials. Id. at 89-90.

First, the court must determine whether the regulation is rationally related to a legitimate and neutral governmental objective. The Fourth Circuit Court of Appeals frequently emphasizes that great deference must be given to prison administrators with regard to security matters. As the Fourth Circuit has noted:

> In the difficult and dangerous business of running a prison, frontline officials are best positioned to foresee threats to order and to fashion responses to those threats. Hence, the evaluation of penological objectives is committed to the considered judgment of prison administrators, who are actually charged with and trained in the running of the particular institution under examination. When a state correctional institution is involved, the deference of a federal court is even more appropriate. Prison officials should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.

In re Long Term Administrative Segregation of Inmates Designated as Five Percenters, 174 F.3d 464, 469 (4th Cir.1999).

Regulations affecting sending of mail to prisoners are centrally concerned with maintenance of prison order and security and are, therefore, measured under reasonableness test of Turner v. Safley, supra; Thornburgh v. Abbott, 490 U.S. 401, 404 (1989) (recognizing a different standard might apply to legal mail). A rule restricting receipt of hardcover books to those sent directly from the publisher, book club, or bookstore does not violate prisoner's First Amendment rights, at least in certain circumstances. Bell v. Wolfish, 441 U.S. 520, 550-51 (1979); Zaczek v. Hutto, 642 F.2d 74, 75 (4th Cir. 1981). "Publisher only" rule is not minimal First Amendment requirement. Hause v. Vaught, 993 F.2d 1079, 1083-84 (4th Cir. 1993) (restrictions on receipt of outside reading material constitutionally valid where detention center had legitimate interest in preventing use of publications to smuggle contraband or start fires).

An unreasonable delay in delivery or mailing may state cognizable claim. Bolding v. Holshouser, 575 F.2d 461, 464-65 (4th Cir. 1978). However, delays that are the product of prison regulations reasonably related to legitimate penological interests are not of constitutional significance, even when they result in actual injury. Lewis v. Casey, supra.

Defendants submitted the affidavit of Michael Illes who attests that he is currently employed by the Horry County Sheriff in Horry County, South Carolina but was employed as the Administrator of the Florence County Detention Center during the time of the allegations in the complaint. (Illes affidavit, doc. #74-6). His duties as Administrator of the Florence County Detention Center ("FCDC") included the day-to-day administration of the Florence County Sheriff's policies with regards to the inmates housed at the Detention Center and various other administrative tasks. Id. Illes attests that he had no personal involvement with the plaintiff while housed at the FCDC except to review his complaints through the "inmate request form" system. Id..

Defendants submitted the affidavit of June Stewart ("Stewart").[6] At the time of the affidavit, Stewart did attest that she was currently employed as the Office Manager of the FCDC and was familiar with the allegations in plaintiff's complaint. (Stewart's affidavit). Stewart was employed as the mail clerk at the FCDC at the time of the allegations in the complaint and her duties included the receipt, handling, processing and delivery of inmate mail at the FCDC. Id. During her tenure as the Mail Clerk, Stewart asserts that an average of over 200 pieces of mail would come in daily

---

[6] Defendants filed a "Suggestion of Death" as to defendant Stewart asserting that pursuant to Rule 25(a)(1), Fed.R.Civ.P., they were suggesting the death of Defendant June Stewart, on or about August 25, 2008. They further stated that "upon information and belief, Ms. Stewart was intestate at the time of her passing, and no estate has been instituted on her behalf. Upon information and belief, Ms. Stewart is survived by her next of kin and/or successor Mr. David H. Stewart. At the time of her passing Ms. Stewart resided in Williamsburg County." (See doc. #144).

and would have to be handled, processed, searched for contraband, and delivered to the proper inmate. Id. Plaintiff received several pieces of mail a day during his stay at the FCDC. Id. At the time of the alleged incidents, it was the policy of the FCDC that incoming mail to inmates be opened and inspected for contraband and policy to open incoming legal mail in the appropriate inmate's presence. Id. Based on the FCDC policy on incoming legal mail, the mail had to be clearly marked as "confidential" or "attorney-client" or with some other demarcation that would alert the mail staff that the piece of mail was indeed legally privileged mail. Id. Stewart attests that to her knowledge, she never opened any legal mail addressed to the plaintiff that was specifically marked either "confidential" or "attorney-client" or had any other demarcation that would alert her or the rest of the mail staff that the piece of mail was in fact legal mail. Id. Due to the volume of mail received by the FCDC on a daily basis, it is not the practice of the Mail Clerk or other staff members to actually "read" the incoming mail, but merely scan the contents of the mail for contraband. Id. With regard to second class mail, it is the policy of the FCDC that receipt of newspapers is a privilege and receipt of magazines is not allowed at all. Id. The FCDC has a full library where inmates can check-out magazines and other reading materials. Id. Stewart attests that during her tenure as Mail Clerk, it was the FCDC policy that inmates could only receive the current day's newspaper each day, not to include holidays and weekends, because there were no administrative employees present on holidays and weekends to process that mail. Id. The policy regarding newspapers and the second class mail items was formulated to reduce the risk of fire hazard associated with an accumulation of newspapers in the mail room and in the inmate's cell. Id.

Defendants submitted the affidavit of Lynn Gunter ("Gunter") who attests that he has been employed by the Sheriff of Lexington County at the Lexington County Detention Center (LCDC)

since March of 1990 and has been Lieutenant since October of 1994. Gunter asserts that in his capacity as Lieutenant over Support Services at the LCDC he is responsible for the supervision of several administrative operations at the LCDC, including the supervision of the mail process. Id. Plaintiff was held at the LCDC from September 30, 2004, through December 3, 2004. Id. The LCDC has a policy and procedure for the inmate and distribution of mail for inmates which was made effective on April 1, 1999, is still in effect today at the LCDC. Id.(Attached to the affidavit is a copy of the policy). The policy provides a listing of certain items which will not be delivered to the inmate, opened or examined by staff which includes newspapers, magazines, books, or any packages. Id. Packages include padded/bubbled envelopes and oversized envelopes. Id. Inmates at the LCDC are informed of the restriction on the receipt of mail through the LCDC inmate Rules, which, per policy, each inmate receives upon booking. Id. In the Inmate Rules, it clearly states that . . . i. Oversized cards larger than 0" x 8" will not be accepted." j. packages will not be accepted." Mail items which are not delivered to an inmate are returned to the sender's address without examination. Id. Additionally, a photocopy of the outside of the package is made, forwarded to the inmate for his or her signature, and then retained to the files of the LCDC. Id. The policy serves a legitimate penological interest as it prevents the introduction of contraband and weapons into the facility. Id. By refusing to accept packages under the mail policy, the LCDC is able to avoid the extreme administrative cost of carefully searching each and every package that may contain hidden contraband. Id. Additionally, if packages are allowed in the facility, it would be impossible to ensure that all weapons, and other contraband, are kept out of the facility. Id. The only way to ensure that weapons and other contraband are not smuggled into the facility through packages is to refuse to accept packages. Id. Gunter attests that based on the records at the LCDC, plaintiff did receive

approximately 66 pieces of mail while housed at the LCDC, just not packages. (Id., Defendants' exhibit D.). Plaintiff received four (4) packages or oversized envelopes returned to sender. Id. Further, Gunter attests that in some cases if an inmate has sent off for a "package" that he or she needs for a particular reasons, that inmate can fill out a request to staff asking for pre-approval of the particular package. Id. In this case, if there are compelling reasons and no security risks, the inmate may be allowed to receive that particular package, but such incidents are not usual and would require pre-approval. Id. If the package arrives without pre-approval, then it would be returned to sender per the previously mentioned policy. Id. However, since the inmate is given a photocopy of the returned package, the inmate is free to make other arrangements with the sender to have the package sent to his or her attorney or his or her family. Id. All inmates, regardless of their race, are treated the same under the policies and procedures of the LCDC. Id.

As to the first factor in Turner, the FCDC and LCDC policy is rationally related to legitimate and neutral governmental objectives. These policies were adopted to prevent contraband, such as weapons and drugs, from being brought into the FCDC and LCDC through the mail. The prohibition applies to all types of magazines regardless of content and the receipt of newspapers is a "privilege" at the FCDC. (Stewart affidavit). Based on a copy of the policy submitted with Stewart's affidavit, it states that one exception at the FCDC is that inmates are allowed to "receive through the mail current issues of newspapers if they have a subscription. The inmate may receive one issue at a time in his/her cell but before receiving the next issue he/she must relinquish the prior newspaper to the housing unit officer to be discarded." This policy also reduces the fire hazards by preventing the accumulation of large amounts of paper and other packages. (See affidavit of Stewart). At the LCDC, the items of mail not accepted included newspapers, magazines, books, or

13

any packages which include padded/bubbled envelopes and oversized envelopes. (See Exhibit B attached to Gunter's affidavit).

Turning to the second factor in <u>Turner</u> and whether there are alternative avenues remaining open for the plaintiff to exercise his rights, the court notes that the policy of the LCDC and the FCDC does not deprive the plaintiff of all mail. It merely restricts it. Further, the policy at LCDC allows for exceptions, and inmates can arrange for pre-approval for the receipt of packages in some extraordinary circumstances. (See Gunter affidavit). Additionally, the FCDC has a full library where inmates can check-out magazines and other reading materials. (Stewart affidavit).

The third factor in <u>Turner</u> is "the impact accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally." 482 U.S. at 90. The ban reduces the associated administrative costs and burdens that would occur if packages were allowed into the facility. (See Gunter and Stewart affidavits).

Finally, in assessing whether the presence of ready alternatives undermines the reasonableness of the policy, <u>Turner</u> does not impose a least restrictive alternative test. The issue is whether the prisoner has pointed to some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a de minimis cost to the valid penological goal. <u>Overton v. Bazzetta,</u> 539 U.S. 126, 136 (2003). The Supreme Court described this as a "high standard" to meet. <u>Id</u>. As the Supreme Court recognized, restriction on privileges are an effective "management technique" in controlling "high-security prisoners who have few other privileges to lose." <u>Id</u>. at 134. The plaintiff has not offered any reasonable alternative. Plaintiff alleges that he received newspapers while at the FCDC and references one specific occasion when mail from the State of South Carolina Public Service Commission was returned to sender marked as "too large."

14

As to one of the two occasions plaintiff referenced, plaintiff actually received the mail marked "Legal mail" but was notified to inform the sender that it should not be more than 4 sheets thick. Plaintiff has not shown any actual injury and has failed to present any evidence to show that the mail regulations at issue do not have a valid, rational connection to a legitimate penalogical interest, and he has therefore failed to show a violation of his constitutional rights.[7] Turner v. Safley, supra; Vester v. Rogers, 795 F.2d 1179, 1183 (4th Cir.1986); see generally Block v. Rutherford, 468 U.S. 576, 584-585, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984) [Prison administrators should be accorded wide ranging deference in the adoption and execution of policies that in their judgment are needed to preserve internal order and discipline and to maintain institutional security]; Sweet v. South Carolina Department of Corrections, 529 F.2d 854, 859 (4th Cir.1975) (en banc) [describing federal court's deference to prison administrators and all administrative matters unless the condition rises to the level of a constitutional violation]; cf Anderson v. County of Kern, 45 F.3d 1310, 1316 (9th Cir.1995) [Prison officials must be given "wide-ranging deference" with respect to their need to maintain order, discipline, and "institutional security"], *reh'd denied*, 75 F.3d 448 (9th Cir.1995), *cert. denied*, County of Kern v. Anderson, 516 U.S. 916, 116 S.Ct. 306, 133 L.Ed.2d 210 (1995).

Furthermore, while they must always adhere to the strictures of the Eighth Amendment, prison officials should enjoy latitude in taking preventive measures to maintain the safety of prison employees who come in contact with inmates. The Supreme Court has clearly recognized the danger of overstepping the boundaries of judicial review in this area:

> "Prison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve

---

[7] The burden is on the person challenging the regulations at issue to disprove their validity. Overton v. Bazzetta, 539 U.S. 126, 132, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003)

15

> internal order and discipline and to maintain institutional security." That deference extends to a prison security measure taken in response to an actual confrontation with riotous inmates, just as it does to prophylactic or preventive measures intended to reduce the incidence of these or any other breaches of prison discipline. It does not insulate from review actions taken in bad faith and for no legitimate purpose, but it requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice.

Whitley v. Albers, 475 U.S. 312, 321-22, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (quoting Bell v. Wolfish, 441 U.S. 520, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)).

Based on the foregoing, plaintiff fails to show that the policy of the FCDC and the LCDC is not reasonably related to a legitimate penological goal. Accordingly, the defendants should be granted summary judgment on this claim.

### D. ELEVENTH AMENDMENT IMMUNITY

The defendants contend that plaintiff's §1983 claims against the named defendant Sheriffs for money damages in their official capacities are barred pursuant to their Eleventh Amendment Immunity. Defendants also argue that the action against defendants Illes and Stewart should be dismissed as a matter of law to the extent that they are sued in their official capacity because as an employee of the Sheriff, they are considered "arms of the State." acting in their official capacity.

When a defendant is sued in his or her official capacity, the suit is frequently intended as one against the state, the real party in interest. If review of the pleadings indicates that the state is, in fact, the party being sued, then a judgment awarding damages is precluded by the Eleventh Amendment of the United States Constitution. Although declaratory and/or injunctive relief may be granted, damages may not be awarded against the state.

In the case of Will v. Michigan Department of State Police, 491 U.S. 58 (1989), the Supreme

Court analyzed the interplay between § 1983 and the Eleventh Amendment of the Constitution and stated:

> Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties. The Eleventh Amendment bars such suits unless the State has waived its immunity (cites omitted) or unless Congress has exercised its undoubted power under § 5 of the Fourteenth Amendment to override that immunity.

The Eleventh Amendment immunity granted to the states "applies only to States or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes," but the court found that state agencies, divisions, departments and officials are entitled to the Eleventh Amendment immunity. Will, supra at 70. In reaching this conclusion, the court held that a suit against state officials acting in their official capacities is actually against the office itself, and therefore, against the state. State officials may only be sued in their individual capacities.

In Gullege v. Smart, 691 F. Supp. 947 (D.S.C. 1988), the court undertook an analysis of the status of South Carolina sheriffs. Based on the following facts, the court concluded that South Carolina Sheriffs were state officials: (1) the state constitution established the office of sheriff and provided that the General Assembly determines a sheriff's powers and duties; (2) state law sets out the sheriff's duties and compensation; (3) the sheriff's arrest powers relate primarily to state offenses; and (4) the Governor is empowered to fill vacancies or remove the sheriff for misconduct. See Id. at 954. The court also found that deputy sheriffs are more closely connected to the state than the county. See Id. at 955. Deputy sheriffs are agents of the sheriff and "are not employees of the county and [are] not covered by county personnel policy and procedure." Cone v. Nettles, 417

S.E.2d 523, 525 (S.C.1992).

The Fourth Circuit held that South Carolina Sheriffs are State agents and are not amenable to suit in federal court by virtue of the Eleventh Amendment. Comer v. Brown, 88 F.3d 1315, 1332 (4th Cir.1996) (suit against Sheriff of Greenville County: " ... Sheriff Brown is an arm of the State."). Indeed, any damages to the plaintiff, if awarded in this case, would be paid by the South Carolina State Insurance Reserve Fund. Comer v. Brown, 88 F.3d at 1332 ("Judgments against the Greenville County Sheriff are paid by the South Carolina State Insurance Reserve Fund."). There is no dispute that the defendant Sheriffs and defendants Illes and Stewart, employees of the Sheriff of Lexington County and Florence County, are all state officials acting in their official capacity. Therefore, they are entitled to Eleventh Amendment immunity from monetary damages. Accordingly, it is recommended that the defendants' motion for summary judgment be granted as to these defendants as they are entitled to Eleventh Amendment immunity from monetary damages.

### E. QUALIFIED IMMUNITY

Defendants argue that they are entitled to qualified immunity pursuant to Harlow v. Fitzgerald, 457 U.S. 800 (1982). Defendants argue that plaintiff is unable to state a constitutional claim against them.

When a person is sued in his individual capacity, the court may consider whether that person is entitled to immunity from suit. Immunity is a defense to be asserted by the defendant and the burden of proving entitlement to immunity rests with the defendant asserting it. Once asserted, however, the court should carefully consider whether the person is entitled to either absolute immunity (judicial and quasi-judicial, legislative) or qualified immunity. Once raised, immunity is

a threshold issue, which should be addressed early in the action because if it can be shown to be a valid defense, the defendant is entitled to dismissal or summary judgment. For that reason, the issue of immunity should be addressed before discovery is allowed.

> The doctrine of qualified immunity attempts to reconcile two potentially conflicting principles: the need to deter government officials from violating an individual's federal civil rights and the need for government officials to act decisively without undue fear of judicial second guessing.

Akers v. Caperton, 998 F.2d 220, 225-26 (4th Cir. 1993).

The Supreme Court in Harlow v. Fitzgerald, 457 U.S. 800 (1982), established the standard which the court is to follow in determining whether defendant is protected by this immunity.

> Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

Harlow, 457 U.S. at 818.

In a discussion of qualified immunity, the Court of Appeals for the Fourth Circuit stated:

> Qualified immunity shields a governmental official from liability for civil monetary damages if the officer's "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." "In determining whether the specific right allegedly violated was 'clearly established,' the proper focus is not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged." Moreover, "the manner in which this [clearly established] right applies to the actions of the official must also be apparent." As such, if there is a "legitimate question" as to whether an official's conduct constitutes a constitutional violation, the official is entitled to qualified immunity.

Wiley v. Doory, 14 F.3d 993 (4th Cir. 1994) (internal citations omitted), cert. denied, 516 U.S. 824 (1995). As discussed above, the plaintiff fails to show that the defendants violated any of his clearly

established constitutional or statutory rights. Therefore, defendants are entitled to qualified immunity in their individual capacity. Thus, the undersigned recommends that the defendants' motion for summary judgment be granted on this issue.

### F. INJUNCTIVE RELIEF

Any claims for injunctive and declaratory relief become moot when a prisoner is no longer subjected to the condition complained of. Williams v. Griffin, 952 F.2d 820, 825 (4th Cir. 1991); Ross v. Reed, 719 F.2d 689, 693 (4th Cir. 1983). Plaintiff is no longer housed at the LCDC or the FCDC so that all claims for injunctive relief are now moot.

### III. CONCLUSION

The plaintiff has failed to show that defendants violated any of his constitutional or statutory rights under 42 U.S.C. § 1983. It is therefore, for the reasons stated herein,

RECOMMENDED that the motion filed by defendants (document #74) for summary judgment be GRANTED IN ITS ENTIRETY.

It is FURTHER RECOMMENDED that any outstanding motions be deemed MOOT.

Respectfully Submitted,

s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

August 5, 2009
Florence, South Carolina
**The parties' attention is directed to the important notice on the next page.**